FILED

2010 Mar-23  AM 10:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **EDNA LEE WASHINGTON LEETH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CASE NO.  5:07-CV-0956-SLB** |
| | ) |
| **ATHENS/LIMESTONE    HOSPITAL,** | ) |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 52.)[1] Plaintiff, Edna Lee Washington Leeth, has sued her former employer, defendant Athens/Limestone Hospital, Inc.,[2] alleging that defendant discriminated against her on the basis of her race, African-American, and that it retaliated against her for complaining about discrimination, in violation of federal law.   Plaintiff also alleges a state-law cause of action for defamation.  Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 52), is due to be granted.

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record.

[2]Defendant contends that its correct name is "the Healthcare Authority of Athens and Limestone County, d/b/a "Athens-Limestone Hospital."  (Doc. 20 ¶ 3.)  Neither party has sought to correct defendant's name; therefore, the court will refer to defendant as "Athens/Limestone Hospital," the name set forth in plaintiff's Complaint.

# I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193

F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540

n.12 (11th Cir. 1988))(emphasis added).

Plaintiff is proceeding pro se.  "[O]nce a *pro se* . . . litigant is in court, [she] is subject

to the relevant law and rules of court, including the Federal Rules of Civil Procedure." *Moon*

*v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989).  "[A] pro se litigant does not escape the

essential burden under summary judgment standards of establishing that there is a genuine

issue as to a fact material to [her] case in order to avert summary judgment." *Nalls v.*

*Coleman Low Federal Inst.*, 307 Fed. Appx. 296, 298 (11th Cir. 2009)(quoting *Brown v.*

*Crawford*, 906 F.2d 667, 670 (11th Cir.1990))[unpublished].  "Courts do and should show

a leniency to *pro se* litigants not enjoyed by those with the benefit of a legal education.  . .

. [T]his leniency does not give a court license to serve as *de facto* counsel for a party or to

rewrite an otherwise deficient pleading in order to sustain an action." *GJR Investments, Inc.*

*v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998)(internal citations omitted),

*quoted, in part, in Nalls*, 307 Fed. Appx. at 298.

## II. <u>STATEMENT OF FACTS</u>

The court notes that plaintiff did not dispute defendant's Statement of Facts.

Therefore, defendant's Statement of Facts is deemed admitted for purposes of deciding its

Motion for Summary Judgment.[3]

---

[3]Exhibit A to the Scheduling Order states, "All material facts set forth in the statement
required of the moving party will be deemed to be admitted for summary judgment purposes
unless controverted by the response of the party opposing summary judgment."  (Doc. 29,

1.  Plaintiff Edna Lee Washington Leeth ("Leeth") was employed by Athens-Limestone Hospital for seven months, working only on weekends. [4] [(Doc. 54, Ex. 2 at 218, 319-20.)]

2.  Athens-Limestone Hospital ("the Hospital") provides a wide variety of health-related services to the Tennessee Valley Region of Alabama.  [(Doc. 54, Ex. 1 ¶ 4.)]

3.  Prior to applying at Athens-Limestone Hospital, Leeth had not worked as a nurse since 1988, over fifteen years earlier.  [(Doc. 54, Ex. 2 at 171.)]

4.  Leeth was hired as an at-will employee on or about March 25, 2005. [(Doc. 54, Ex. 2 at 197.)]

5.  Leeth asserts that she was hired to work as a Registered Nurse ("RN") on weekends only and was initially incorrectly paid $17.87 per hour, but was eventually paid $20 per hour after lodging complaints about her initial pay rate.  [(Doc. 54, Ex. 2 at 214, 319.)]

6.  Leeth's job responsibilities included daily shift assessment, administrating medication, adjusting patient care as needed, completing patient treatment, and documenting patient condition, care, and changes.  [(Doc. 54, Ex. 1 ¶ 9.)]

---

Ex. A at 4 [emphasis omitted].)

[4]Plaintiff contends that she signed an employment "contract" on May 2, 2005.  (Doc. 58 at 1.)  This document, entitled, "Weekend Only Scheduling Option," specifically states:

> This document is not a contract and is provided only for the purposes of information and to articulate expectations of the hospital and the participating employee, and shall not be construed as a contract of employment.  Any employment at Athens-Limestone Hospital shall be, and shall remain, employment-at-will, with the right of resignation and termination preserved by at-will employment.

(Doc. 72, Ex. 1, ex. 6.)  The court finds that plaintiff did not have an employment contract.

7.  Nurses were assigned to patients according to the needs of the patients, location of patients, and number of patients.[5]  [(Doc. 54, Ex. 1 ¶ 13.)]

8.  Leeth generally alleges that the "worst patients," usually located in the front rooms (Rooms 200 through 206), were routinely assigned to African-American nurses, however, she is able to describe only one instance with any specificity in which she claims that she was assigned the "worst group of patients."  In that one instance, Leeth concedes that she was assigned the front or "worst patients" because Patricia Shoulders, the other nurse on duty that day, also an African-American, had not arrived at the Hospital yet.  [(Doc. 54, Ex. 2 at 102-08; 120.)]

. . .

11.  [Wanda] Fortner[, Nurse Manager,] and [Jan] Perkins Lenz[, Director of Nursing,] also counseled Leeth at least two times during her seven month, part-time, weekend-only employment, for not getting along with her co-workers and for rudeness to her managers that bordered on insubordination.  [(Doc. 54, Ex. 2 at 232, 314-15, 326-27; doc. 72, Ex. 1, exs. 15, 18.)]

(Doc. 53 at 1-3.)

Plaintiff testified that, initially, Glenna Gooch and Pyia Patel, non-African-American

PCAs [patient care assistants], were hostile to her and reluctant to assist her patients.  (Doc.

---

[5]Plaintiff alleges, "[N]urses were assigned their patients according to previous assignments . . . .  Also the patients were assigned based on race; African[-]American staff got the worst patients if a white or non-black charge nurse worked on that shift."  (Doc. 58 at 1-2 [citing doc. 54, Ex. 3].)  The only evidence cited by plaintiff for this assertion in the affidavit of Patricia Shoulders, an African-American licensed practical nurse that formerly worked for defendant.  (*Id.*; doc. 54, Ex. 3 ¶¶ 1, 3.)  However, Shoulders's testimony does not support plaintiff's assertion.  Indeed, she testified, "I believe that the assignment of nurses was not in any way related to the race of the nurse or the patient."  (Doc. 54, Ex. 3 ¶ 14.)  Therefore, for purposes of deciding defendant's Motion for Summary Judgment, the court assumes that "nurses were assigned to patients according to the needs of the patients, location of patients, and number of patients."  (Doc. 53 at 2.)

54, Ex. 2 at 149-53.)  She testified, "on several occasions I called for help, and most of the time I [was not] getting it."  (*Id*. at 304.)  She recalled three specific instances during her deposition.  (*Id*. at 153, 306.)  However, plaintiff testified that "they weren't as hostile towards me after they learned who I was."  (Doc. 54, Ex. 2 at 149-50.)

In her Affidavit, plaintiff testified:

On or about July 8, 2005 I fell on the job, at Athens-Limestone Hospital while performing my duties as a Registered Nurse.  Although I initially filed no incident report of injuries, the nurse manager, supervisor and director of nursing were made aware the same day of the fall.  In August 4, 2005 when I began to have symptoms of pain and stiffness that [I] told my nurse manager because I felt that I needed to make an incident report; but I was told that it was "too late" since they "could not perform a urinalysis drug test."

I continued to work on the same unit but my physical conditions and the working conditions got worse.

(Doc. 11, Ex. A at 3.)

According to defendant,

9.  On August 5, 2005, Leeth was counseled by Wanda Fortner, Nurse Manager, for missing four shifts.  Leeth was working weekends only, and had only been employed at the Hospital for four months at the time she received this counseling.  [(Doc. 54, Ex. 2 at 318-19, Ex. 16.)]

10.  Because she was working a weekend-only schedule, Leeth was allowed only one PTO/sick time in a six-month period without penalty.  [(Doc. 54, Ex. 1 ¶ 12; Doc. 54, Ex. 2 at 319; doc. 72, Ex. 1, ex. 6.)]

(Doc. 53 at 3.)  This warning stated:

Documentation:  According to our agreement regarding "Weekend Only Scheduling" you are receiving a verbal warning as a result of 4 days that you missed either all or part of your scheduled weekend shifts.  In the referred to agreement you are only allowed PTO/Sick Time one (1) weekend in a six-

6

month period without penalty.  I would like to take this time to impress upon
you the hardship placed on your fellow co-workers when you call out on days
you are scheduled to work.  Failure to improve this matter could result in loss
of your weekend only shift/weekend pay.

(Doc. 72, Ex. A, ex. 16.)   Plaintiff noted on the warning, "Although I am signing this

warning it[']s because I have to.  I feel that this is not realistic."  (*Id*.)

Defendant, in its Statement of Facts, set forth plaintiff's last work day as follows:

12.  On October 16, 2005, Leeth arrived for her scheduled shift.  Denise
Schrimsher was the Charge Nurse for the shift.[6]  [(Doc. 54, Ex. 2 at 104.)]

13.  As part of her duties as Charge Nurse, Schrimsher assigned Leeth
the patients in Rooms 200-209.  Patricia Shoulders, the LPN on that shift, was
assigned to the patients in Rooms 210-225.  [(Doc. 54, Ex. 2 at 107.)]

14.  Patricia Shoulders is a fifty-eight (58) year old African-American
female. [(Doc. 54, Ex. 3 ¶ 1.)]

15.  Leeth refused to accept her patient assignment and insisted that she
wanted to be assigned to the "middle patients".  [(Doc. 54, Ex. 2 at 105.)]

16.   Schrimsher told Leeth that she was taking the first group of
patients, and if she did not like her assignment, she could leave.  [(Doc. 54, Ex.
2 at 112.)]

17.   Leeth told Schrimsher she did not want the patients to which she
was assigned, and left the floor to go speak with Jan Perkins Lenz, Director of
Nursing Services.  [(Doc. 54, Ex. 2 at 112.)]

_____

[6]Plaintiff contends that, prior to her leaving that day, "no determination was made as
to who was going to be in charge on that day." (Doc. 58 at 2.)  She testified that Schrimsher
"was the charge nurse if she was allowed to say and be the charge nurse, and if I didn't object
to her being it."  (Doc. 54, Ex. 2 at 357.)  However, prior to the time she left, plaintiff had
contacted Perkins Lenz, and Perkins Lenz told her that "she agreed with Denise."  (*Id*. at
116.)  The record contains no evidence to dispute the fact that, at least by this time, plaintiff
knew that Schrimsher was the charge nurse for the day.

7

18.  Leeth met with Jan Perkins Lenz who did not overturn the patient assignment given by Schrimsher, and Leeth left the Hospital.  [(Doc. 54, Ex. 2 at 114-16.)]

19.  As a result of Leeth leaving the Hospital and not caring for the patients that Schrimsher had assigned to her, the Hospital had to call in a nurse from another floor to cover Leeth's patient responsibilities for that shift. [(Doc. 54, Ex. 2 at 117.)]

(Doc. 53 at 3-4.)  In her deposition, plaintiff testified:

And the particular time was the last time I was there.  And I had worked the day before and had patients in room where I had – my patients [were] from room 207 to 214 or 215.  And I had also pulled a charge.  The next day that I got there is Ms. Denise [Schrimsher] . . . saying that my patients [were] going to be the first – and that's what we called them, the first, second or third group. . . . And I explained to her, I said, Well – and I knew she was going to be in charge.  She was there longer than I was, and so she was going to be pulling charge.  That [was not] a problem.  But she said, You have the first patients."  And I told her, I said, "I had – "  "Yesterday I had the middle.  I'll take the middle."  And she said, "Well, you have the first patients."  I said, "Well, I had the middle yesterday."  And I thought that she didn't understand what I was saying about, you know – because I worked the next day.  But the first group was the worst group of patients.  Wouldn't have been a problem if she had explained to me why she needed me to take the first group of patients over the LPN that hadn't worked the day before either.  Usually what we did was the person that worked the day before got their choice of the patients.  And her contention was that I was going to take what she told me I was going to take. I was going to do what she told me to do, and it didn't matter what I did or what I said.  She [was not] going to pull charge.  It didn't matter because a lot of times an RN [was not] pulling charge.  I chose to pull a charge and then reduced the work load on the people that I was working with.  And then she [Schrimsher] got nasty with me.  And I call Jan Perkins [Lenz] and explained to her what was going on.  And she [Schrimsher] told me if I didn't like[,] not taking the patients[,] but didn't like her attitude about it that I could leave. And I called Ms. Perkins [Lenz] before I left.  . . .

(Doc. 54, Ex. 2 at 104-06.)  Plaintiff testified that she called Perkins Lenz and, "Ms. Perkins

[Lenz] called Denise up, and we talked.  And Densie was  very upset, and I was upset with

the way that I was being treated.  And Ms. Perkins [Lenz] said, 'Well, I agree with Denise.'"
(*Id*. at 114-15.)  Thereafter plaintiff left.  (*Id*. at 115.)  Plaintiff testified that Perkins Lenz
never told her she would be fired if she left the hospital that day; if she had known she would
be fired, she would not have left.  (*Id*. at 157-58.)  In her Affidavit, she testified:

> ***The unit became a hostile workplace***.  On October [16,] 2005 I was verbally
> attacked by a White co-worker; and when I reported the incident to the director
> of nursing she said that she supported the treatment, which was abusive, given
> to the plaintiff by the co-worker.  I was told that if I did not like the decision
> of the nurse that performed abusive treatment, then I could leave.  Therefore
> at the order of the director of nursing I left the facility; to prevent any other
> abuse to myself or other hostility during the shift.

(Doc. 11, Ex. A at 3 [emphasis added].)

Plaintiff met with Perkins Lenz on October 21, 2005, before beginning her next shift.

Defendant contends:

> 21.  On October 21, 2005,[7] Leeth met with Jan Perkins Lenz, Beverly
> Scott, and Rachel Frey, Human Resources Director, to discuss the incident of
> October 16, 2005.  [(Doc. 54, Ex. 2 at 119.)]
>
> . . .
>
> 23.  Jan Perkins Lenz's impression and belief during the October [21],
> 2005 meeting was that Leeth was declining to accept responsibility for the fact
> that she refused to take a reasonable assignment, and that she was refusing to
> work with management to prevent this type of situation from recurring.  [(Doc.
> 54, Ex. 1 ¶ 31.)]

---

[7]The parties refer to this meeting as occurring on October 20 or October 21, 2005.
They agree that the meeting occurred on plaintiff's next scheduled workday following
October 16, 2005, which would have been Friday, October 21, 2005.

(Doc. 53 at 5.)  Plaintiff testified that, during this meeting, she gave Perkins Lenz and the other a note from her doctor, which limited her to "light lifting."  (Doc. 54, Ex. 2 at 248-49.) She contends she "was told they didn't have light duty," and that Perkins Lenz "stormed" out of the room, saying "that changes everything."  (*Id*. at 233, 248-49.)  Scott told plaintiff to call them after she saw her doctor.  (*Id*. at 249.)  Plaintiff did not return to work.

On October 26, plaintiff again met with Perkins Lenz and Frey; according to defendant, the following occurred:

> 24.  As a result of Leeth's insubordination, and refusal to accept responsibility, the Hospital terminated Leeth's employment on October 24, 2005.  [(Doc. 54, Ex. 1 ¶ 32.)]

> 25.  Rachel Frey, Human Resources Director, and Jan Perkins Lenz, Nurse Manager, met with Leeth on October 26, 2005 to inform her of the termination.  [(Doc. 54, Ex. 2 at 119.)]

> 26.  Leeth attempted to bring her husband to the meeting with her, but the Hospital asked to speak to her alone.  [(Doc. 54, Ex. 2 at 252.)]

> 27.  Jan Perkins Lenz gave Leeth her termination letter and informed her that her employment with the Hospital was terminated.  [(*Id*.)]

> 28.  Within only about seven months of being hired, on October 24, 2005, Leeth was terminated for performance issues including insubordination and refusing to accept her patient assignment.[8]  [(Doc. 54, Ex. 1 ¶ 32; doc. 72, Ex. 1, ex. 11.)]

---

[8]Plaintiff argues that the only reason she was given for her termination was that Alabama was an at-will state. (Doc. 58 at 3.)  While Perkins Lenz and Frey told plaintiff that Alabama was an at-will state, this information was given as the reason for not telling plaintiff a reason for her termination; it was not the reason for plaintiff's termination.  (*See* doc. 59 at 3, 10, 16-17.)

(Doc. 53 at 5-6 [footnote added].)

Plaintiff filed an EEOC charge on April 21, 2006, alleging that she was discriminated against between October 16 and October 26, 2005, on the basis of her race and retaliated against "for reporting the treatment of black patients in the hospital."  (Doc. 72, Ex. 1, ex. 11.)  Specifically, she alleged:

> I began my employment with [Athens/Limestone Hospital] on March 25, 2005.  I was employed as a registered nurse.  I was the only black female on my shift of seven registered nurses.  In June 2005, I made a verbal complaint to Ms. [Wanda] Fortner, Nurse Manager and later to the Director of Nursing, Jane Perkins [Lenz] and the Chief Executive Officer, Mr. Phillip Dotson in writing that black patients were not provided as efficient care as the white patients.  I was called into a meeting with the director of nursing and my nurse manager and told to stop complaining and I could quit if I was unhappy.  They also stated that I was on the line of being insubordinate.  On July 8, 2005, I fell on the job and continue[d] to work because I did not feel any immediate distress.  I notified my nurse manager but did not fill out a report at that time.  Over a two-week period I began to have medical problems due to my fall.  On August 5, 2005, I was given a verbal warning for leaving work sick.  I was also suspended for a day on October 16, 2005, when I reported a verbal altercation with another white female registered nurse and she was not.  On October 18, 2005, I was told by my doctor to return to work with a restriction of light lifting until I was seen by the workman-comp doctor on October 26, 2005.  I returned for a meeting with the director of nursing, the nurse manager and Ms. Rachel Frey, Director of Human Resource[s] on October 20, 2005.  Once I gave everyone copies of my doctor's slip the director of nursing said[,] "[T]hat changes everything[;] we don't have light duty for anyone, no RNs, LPNs or PCAs."  When I arrived at the hospital on October 26, 2005, I was told by Ms. Jane Perkins [Lenz], Director of Nursing, that I was terminated, which was effective October 24, 2005.  When I asked for what reason was I terminated, Ms. Perkins [Lenz] stated, "Alabama is an at will state[;] we did not have to give you a reason."

> I believe I have been discriminated against because of my race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended.  I also believe I have been retaliated against for reporting the treatment of black

patients in the hospital.  I further believe the treatment I received was due to after I graduate in December 2005, with my bachelor's degree, I would have been eligible as the most qualified person for management and supervisory position that was currently being posted.  There are currently no black administrators, supervisors, RNs or LPNs on staff at this location.

(*Id*.)  Defendant responded to plaintiff's Charge as follows:

Athens-Limestone Hospital denies that it discriminated against Edna L. Leeth and denies it retaliated against her.  . . .  Soon after starting work with Athens-Limestone Hospital, Ms. Leeth had to be counseled, verbally and in writing, on her less than satisfactory performance.  Ms. Leeth's job performance was not satisfactory, as is documented in evaluations and counseling statements she received during the short period she worked at Athens-Limestone Hospital.  Ultimately, in October 2005, Ms. Leeth refused to assist a patient.  This was, obviously, unacceptable for a nurse charged with providing health services at a hospital.  On October 24, 2005, Ms. Leeth was terminated for the performance issues and for refusing to assist a patient.  She was notified of the termination in a meeting with Athens-Limestone Hospital personnel, and was provided written notice of the termination as well.  Ms. Leeth had worked for Athens-Limestone Hospital for about seven months at the time of her termination.

Ms. Leeth initially, and for the short period of time she worked for Athens-Limeston Hospital, demonstrated at least a satisfactory level of proficiency with regard to many of her technical nursing skills.  However, she refused to follow policies, did not work with other employees well, did not complete assignments following accepted policies and procedures, did not assure accuracy of data, work and information, did not demonstrate effective time management, did not have a positive relationship with her peers, and had problems finishing her work in a timely manner.  Her attitude ultimately became contemptuous, with Ms. Leeth refusing an assignment of a patient.

. . . Ms. Leeth was not terminated on the basis of her race.  She was not retaliated against for "reporting treatment of black patients" or for graduating from college, as she seems to allege in her Charge.  Ms. Leeth was terminated for performance problems and for refusing an assignment of a patient.

(Doc. 72, Ex. 1, ex. 23.)

12

Plaintiff received a right-to-sue letter on or about March 1, 2007 and filed her Complaint in this court on May 23, 2007.  (Doc. 1.)

## III.  DISCUSSION

### A.  DEFAMATION

In her Complaint, plaintiff alleges, "The defendant reported false information to the EEOC to prevent the Pro Se Plaintiff from receiving favorable report against [it] and a right to sue," and, "The defendant caused the Pro Se Plaintiff to lose the assistance of an attorney when [it] reported the false accusation against the Pro Se Plaintiff to the attorney and EEOC." (Doc. 1 ¶¶ 16-17.)  Defendant contends that it is entitled to summary judgment on plaintiff's defamation claim because its statements to the EEOC are "absolutely privileged and cannot be the basis for a claim of defamation."  (Doc. 53 at 8-9.)

Alabama has adopted Section 587 of the Restatement (Second) of Torts, which provides:

> A party to a private litigation . . . is ***absolutely privileged*** to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Restatement (Second) of Torts § 587 (emphasis added); *see Hollander v. Nichols*, 19 So. 3d 184, 195-96 (Ala. 2009); *Walker v. Majors*, 496 So. 2d 726, 729-30 (Ala. 1986).  "[W]hether the communication was privileged or not by reason of its character, or the occasion on which it was made, is a question of law to be decided by the court."  *Walker*, 496 So. 2d at

13

730(citing *O'Barr v. Feist*, 296 So. 2d 152, 156 (Ala. 1974); *Interstate Electric Co. v. Daniel*, 151 So. 463, 466 (Ala. 1933); *Kenney v. Gurley*, 95 So. 34, 38 (Ala. 1923)).  Because the EEOC investigation is quasi-judicial and is a prerequisite to a civil action, the statements contained in defendant's response to the EEOC are absolutely privileged if they bear some relation to the proceedings.  *See Bernstein v. Seeman*, 593 F. Supp. 2d 630, 636 (S.D.N.Y. 2009); *Hurst v. Jiffy Lube*, 2000 WL 1790112, *5-*6 (E.D. Pa. 2000); *Gandy v. Trans World Computer Technology Group*, 787 So. 2d 116, 119 (Fla. App. 2 Dist. 2001); *Thomas v. Petrulis*, 465 N.E.2d 1059, 1064 (Ill. App. 2 Dist. 1984).

Plaintiff contends that the defendant defamed her in its response to her EEOC charge when it told the EEOC plaintiff was "incompetent," "[t]hat [she] walked out on patients when [she] was supposed to have been taking care of patients," and "[t]hat [she] was abusive to the people that [she] worked with."  (Doc. 54, Ex. 2 at 199-200.)  These statements, made to explain why it terminated plaintiff, (*see* doc. 72, Ex. 1, ex. 23), are undeniably related to the issues raised in plaintiff's EEOC charge.  The court finds that defendant's statements are absolutely privileged.

Defendant is entitled to judgment as a matter of law as to plaintiff's defamation claim. The court will grant its Motion for Summary Judgment and dismiss plaintiff's defamation claim.

## B.  EMPLOYMENT DISCRIMINATION CLAIMS

In her Complaint plaintiff alleges:

20.   The defendant [was] not paying the Pro Se Plaintiff the wages due her as an experienced RN of 10 years.

21.   The defendant refused to allow the Pro Se Plaintiff to have the unit that she had requested to be employed on because it was not as difficult; and [there] were no African[-] American RNs working on other units.

22.   The Pro Se Plaintiff was forced to take more assignments than other employees even when there were fewer patients.

23.   The Pro Se Plaintiff was forced to take more difficult assignments than other employees and without assistance most of the time.

24.   The Pro Se Plaintiff was reprimanded with [an] oral warning that she had to sign when off sick.

25.   The Pro Se Plaintiff was suspended from work for avoiding "hostile work environment" and being verbally [attacked] by a white co-worker.

26.   The Pro Se Plaintiff was forced to work in hostility in the workplace and verbal [attack] from white and non-African[-]American co-workers and the defendant would do nothing to prevent it; and was told that the director of nursing agreed with the treatment.

. . .

29.   The defendant terminated the Pro Se Plaintiff because she is African[-]American and requested that the administration do something about the "hostile workplace" and "verbal abuse" that she was suffering [and] also the complaints of patient abuse.

30.   The defendant had only three full[-]time African[-]American Registered Nurses (RN) employed in its facility, which included the Pro Se Plaintiff; and there were at least 32 White RN[s]; with a 20,000+ population of African[-]Americans in the county.

31.   In June 2005 the Pro Se Plaintiff inquired as to why there were not more African[-]American nurses hired . . . and was told by defendant[,] "[W]e hired you, didn't we?"

32.  The Pro Se Plaintiff was reprimanded for complaints of subordinate treatment to her and the inferior work performance by the White nurses' assistants.

33.  The Pro Se Plaintiff was told by the defendant that there was no light duty work for her or anyone at the facility, when White employees, RN, LPN, and PCA (patient care assistants) were allowed to return to work light duty frequently.

34.  After terminating the Pro Se Plaintiff the defendant moved a White nurse into her nursing position from another shift, and then later hired two other White nurses[.]

35.  The Pro Se Plaintiff was paid less in wages than she was entitled due to the 10 years of experience she had, and when questioned why the wages [were] not what [defendant] promised . . . her; she was told "because you have not worked in 14 years."

(Doc. 1 ¶¶ 20-26, 29-35.)

In this circuit –

Where direct evidence of discrimination is absent, a plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: '(1) [she] belongs to a racial minority; (2) [she] was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job.'"

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting

*Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973)); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319,

1323 (11th Cir. 2006).  If plaintiff establishes a prima facie case of discrimination, the

burden shifts to defendant to articulate a legitimate, nondiscriminatory reason or reasons for

its decision.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2007).  Then,

16

plaintiff must rebut defendant's reason or reasons either (1) by presenting evidence that discrimination was the real reason for the decision, or (2) by presenting evidence that defendant's reasons are "unworthy of credence." *See Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied* 546 U.S. 960 (2005).

> To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.

*Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005)(internal quotations and citations omitted). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)).

Plaintiff alleges a number of adverse employment actions, which the court will discuss separately.

### 1. Pay

Plaintiff alleges that she was paid less because of her race. (Doc. 1 ¶¶ 20, 35.) In her deposition, she testified, "[Defendant] hired me in and said I would be making twenty dollars an hour. . . . I was making seventeen dollars and eighty-seven cents. And when I complained about it, eventually they started paying me twenty dollars an hour." (Doc. 54,

Ex. 2 at 214.)  She contends that she should have been paid $20 an hour and that her pay was raised to $20 an hour in June 2005.  (*Id*. at 214-15.)

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage."  *Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)(citing *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992); *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991)); *see also Hill v. Emory University*, No. 09-10350, 2009 WL 2599612, *4 (11th Cir. 2009).

The record contains no evidence of any nurses that were similarly situated to the plaintiff, i.e., a new hire with ten years of experience that had not worked as a nurse in fourteen years.  Also, the record contains no evidence of the pay of any nurse other than the plaintiff.  Therefore, the court finds that plaintiff has not established a prima facie case of race discrimination with regard to her pay.

Summary Judgment will be granted in favor of defendant as to plaintiff's discriminatory pay claim and such claim will be dismissed.

### 2. Job Assignments

Plaintiff complains that defendant assigned her more difficult patients and more patients because of her race. (Doc. 1 ¶¶ 21-23.)  Specifically, she contends that she requested

18

to be assigned to the CCU unit, where she would have one or two patients; yet defendant assigned her to the "med surge floor" where she had an average of nine patients. (Doc. 54 at 216.) Also, she contends that on one occasion, during her orientation, she and the nurse she was working with were assigned eight patients, while the other two nurses split seven patients.[9] (Doc. 54 at 142-45.) Plaintiff testified that she was assigned the "worst" patients, the patients that needed the most care, and that the PCAs did not help her on occasion. (Doc. 54, Ex. 2 at 102-06, 304-09.)

The court notes "not all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001)(citations omitted).   In discussing the "adverse employment action" element in a Title VII discrimination case, the Eleventh Circuit Court of Appeals has held:

> [I]t is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way.   Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.   We therefore hold that, to prove [an] adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a ***serious and material*** change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

---

[9]Plaintiff testified that she was working with Neha Patel, a non-African-American RN, during her orientation and, "So, I would be the one that actually took care of patients and she would help me because I was on orientation."  (Doc. 54, Ex. 2 at 143-44.)

*Id*. at 1239 (emphasis in original).

"Whether a particular [job assignment] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006)(quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998))(internal quotations omitted). Differences in work assignments are generally not adverse employment actions because such claims "strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis*, 245 F.3d at 1244 (citations omitted). Thus, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on [her] disagreement with [her] employer's reassignment of job tasks." *Id*. "In the vast majority of instances," discrimination claims based on "a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress . . . ." *Id*. at 1245 (citations omitted).

The court finds plaintiff's assignment to the "med surge floor," the single assignment of eight patients during her orientation period when she shared these patients with her training nurse, her assignment on occasion of the "worst" patients, and the occasional lack of assistance from PCAs are not of such a detrimental character as to work a ***serious and material*** change in the terms, conditions, or privileges of plaintiff's employment. These job

assignments, which plaintiff viewed subjectively as adverse, did not constitute material changes to the terms, conditions, or privileges of her employment. "A temporary assignment of undesirable duties does not constitute an adverse employment action, especially where those duties are a part of the employee's job description." *Rhodes v. Illinois Dept. of Transp.*, 243 F. Supp. 2d 810, 818 (N.D. Ill. 2003). "[I]n the majority of instances, 'a change in work assignments, without any tangible harm' is outside the protection of Title VII's anti-discrimination clause, 'especially where . . . the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification.'" *Hyde v. K.B. Home, Inc.*, No. 09-11755, 2009 WL 4269800, *2 (11th Cir. Dec. 1, 2009)(quoting *Davis*, 245 F.3d at 1245))[unpublished].[10]

Plaintiff has failed to present evidence that her assignment of the "worst" patients was anything more than occasional or temporary; she testified that she was not always assigned these patients and, on occasion, she made the actual assignments. Also, she testified that she was assigned the eight patients on a single occasion and she could recall only one specific incident when a PCA refused to help her. Moreover, other than her testimony that she would have responsibility for only one or two patients on the CCU floor, plaintiff has not offered

---

[10]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

21

any evidence to show that assignment to the "med surge floor" was a serious and material change in the terms, conditions, or privileges of her employment with defendant as a nurse. Indeed, the conduct of which plaintiff complains was nothing more than the "ordinary tribulations of the workplace," which are not actionable under Title VII. *Davis*, 245 F.3d at 1239; *see also White*, 548 U.S. at 68 ("We speak of ***material*** adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" (quoting *Oncale*, 523 U.S. at 80)).

Because the court finds that plaintiff cannot establish that her claims based on job assignments were actionable adverse employment actions, defendant's Motion for Summary Judgment will be granted and these claims will be dismissed.

### 3. Light Duty Assignment

Plaintiff alleges that defendant told her "that there was no light duty work for her or anyone at the facility," but that white employees were given light duty work frequently. (Doc. 1 ¶ 33.) Defendant argues that it is entitled to summary judgment on this claim because plaintiff cannot "identify a registered nurse of any race who came back to work on light duty or with restrictions," and because she "has no evidence that the [defendant's] refusal to allow her to come back on light duty was related to her race." (Doc. 53 at 18 [citing doc. 54, Ex. 2 at 235-37, 239-40].)

Plaintiff testified in her deposition that defendant told her it "didn't have light duty." (Doc. 54, Ex. 2 at 234.)  Moreover, she testified that she could not identify any white RN that had returned to work with restrictions and was assigned light duty.  (*Id*. at 234-37.)  She testified that "Ms. Perkins had told the EEOC that [defendant] had light duty," (*id*. at 234, 236); however, plaintiff did not submit any evidence of this statement and the record does not indicate any RN, African-American or White, received a light-duty assignment.

To establish a prima facie case of race discrimination with regard to her claim based on the light-duty assignment, plaintiff must prove that a light-duty assignment was available and that a light-duty assignment was given to a similarly-situated white employee. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 975-76 (11th Cir. 2008).  Plaintiff has failed to rebut defendant's showing that she has no evidence sufficient to establish a prima facie case of race discrimination with regard to her claim based on defendant's failure to assign her to light duty.  Therefore, defendant's Motion for Summary Judgment will be granted and this claim will be dismissed.

### 4. Discipline

In her Complaint, plaintiff alleged that she was reprimanded, suspended, and terminated because of her race.  (*See* doc. 1 ¶¶ 24, 25, 29, 32.)

The Eleventh Circuit Court of Appeals held that a plaintiff can establish a prima facie case of discriminatory discipline by proving that she was disciplined more harshly than one outside the protected class for nearly identical conduct.  *Nix v. WLCY Radio/Rahall*

*Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *see also Burke-Fowler*, 447 F.3d at 1323 ("When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the court] evaluates 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'")(quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

### a. Reprimand Regarding Absences

Plaintiff contends that she "was reprimanded with [an] oral warning that she had to sign when off sick." (Doc. 1 ¶ 24.) The reprimand noted that she had missed four days of her scheduled weekend shifts and that failure to improve her attendance could result in loss of her weekend only shift and weekend pay. (Doc. 72, Ex. A, ex. 16.) Plaintiff does not dispute that she missed four days within less than six months, and she does not contend that other nurses, working weekends only, were allowed to miss the same amount of time over six months and were not disciplined. Therefore, she cannot establish a prima facie case of discrimination based on the oral reprimand. *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998)("If Plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case.")(citations omitted), *opinion modified*, 151 F.3d 1321 (1998).

Also, nothing in the record indicates that plaintiff suffered any adverse consequences to the terms, conditions, or privileges of her employment as result of this oral warning.

Therefore, plaintiff has not established that the oral reprimand was sufficiently serious to be actionable under Title VII. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283-84 (11th Cir. 1999)(holding "memorandum [that] merely expressed concern with plaintiff's absences and warned of possible ramifications" was not an adverse employment action because the plaintiff had "not suffer[ed] any repercussions"); *see also  Byrne v. Alabama Alcoholic Beverage Control Bd.*, 635 F. Supp. 2d 1281, 1293-94 (M.D. Ala. 2009)(citing, *inter alia*, *Davis*, 245 F.3d at 1239-41; *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001)); *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009)(citing *Wallace v. Georgia Dept. of Transp.*, 212 Fed. Appx. 799 (11th Cir. 2006)).

Defendant's Motion for Summary Judgment will be granted and plaintiff's discriminatory discipline claim based on the oral warning will be dismissed.

### b.  Suspension

Plaintiff contends that she "was suspended from work for avoiding "hostile work environment" and being verbally [attacked] by a white co-worker." (Doc. 1 ¶ 25.)  In her EEOC charge, plaintiff alleges that she was "suspended for a day on October 16, 2006, when [she] reported a verbal altercation with white female registered nurse and [the white nurse] was not." (Doc. 72, Ex. A, ex. 11.)   Contrary to plaintiff's contentions, she was not suspended on October 16, 2006; she left work voluntarily following her interaction with Schrimsher.

The facts are undisputed that plaintiff left work on October 16, 2006, rather than take Schrimsher's patient assignment.  Plaintiff testified that Schrimsher had told her "if [she] didn't like it [she] could just leave." (Doc. 54, Ex. 2 at 114.)  Perkins Lenz told plaintiff that she agreed with Schrimsher and then plaintiff left.  (*Id*. at 114-15.)  She was not suspended or told to leave; she voluntarily left the hospital.

The law is clear that an employee's voluntary choice between two options, albeit unpleasant choices, is not an adverse employment action for which her employer may be accountable.  *See Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167, 174 (4th Cir. 1988), *quoted in Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).  The adverse consequence of plaintiff's deliberate choice is not an actionable adverse employment action because the consequence does not flow from the employer's decision. *See Hargray*, 57 F.3d at 1567, 1572-73 ("If [plaintiff] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that [defendant] 'deprived' him of it within the meaning of the due process clause." (quoting *Stone*, 855 F.2d at 173)); *Garrett v. Board of Trustees of University of Alabama at Birmingham*, 354 F. Supp. 2d 1244, 1248 (N.D. Ala. 2005)("[Plaintiff] voluntarily sought and accepted a totally different, if lesser paid, position within [defendant's] complex.  There was no treatment that forced her to seek the nursing home position so as to make it into an involuntary act.  The fact that [defendant] agreed to [plaintiff's] voluntary transfer cannot be called an adverse employment action by

[defendant].”); *see also See Evans v. Davie Truckers, Inc.*, 769 F.2d 1012, 1014 (4th Cir. 1985); *Sraieb v. American Airlines, Inc.*, No. 09 C 858, _____ F. Supp. 2d _____, 2010 WL 308834, *4-*5 (N.D. Ill. Jan. 25, 2010); *Banks v. Armed Forces Bank*, 313 F. Supp. 2d 1095, 1103 (D. Kan. 2004); *Sublett v. Edgewood Universal Cabling Systems, Inc.*, 194 F. Supp. 2d 692, 702-03 (S.D. Ohio 2002).

Because plaintiff cannot prove that defendant suspended her on October 16, 2005; she cannot establish a prima facie case of discrimination with regard to any suspension. Defendant’s Motion for Summary Judgment will be granted and plaintiff’s claim based on the alleged suspension will be dismissed.

**c. Termination**

Plaintiff contends that defendant terminated her because she is African-American. Defendant has submitted evidence that it terminated plaintiff “on October 24, 2005[,] as a result of her refusal to accept a patient assignment, refusal to accept responsibility for her actions, and continued inability to get along with her co-workers and supervisors.” (Doc. 54, Ex. 1 ¶ 32.)

**i. Prima Facie Case**

Defendant argues, “[Plaintiff] has not and cannot identify any other employees who refused a reasonable assignment or otherwise acted with perceived insubordination and were treated differently, nor can she establish that she was replaced by a white or non-black employee.” (Doc. 53 at 22 [footnote omitted].) In order to prove a *prima facie* case of race

discrimination, plaintiff must prove that she was replaced by a nurse that is not African-American **or** that defendant treated a similarly-situated employee – that is, an employee involved in nearly identical misconduct – more favorably than plaintiff.

Plaintiff testified that she was replaced on her shift by Pam, a white registered nurse, who moved from third-shift to the day shift on weekends.  (Doc. 54, Ex. 2 at 80-82.)  This is sufficient to establish a prima facie case of discrimination with regard to plaintiff's termination claim.

### ii. Pretext

Defendant contends that plaintiff was terminated because she refused to accept the patient assignment from Schrimsher, she refused to take responsibility for her actions, and she had problems getting along with her co-workers.  (Doc. 54, Ex. 1 ¶ 32.)  Refusing a patient assignment is a reason for terminating a nurse that might motivate a reasonable employer.  *See Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994).

In order to survive defendant's Motion for Summary Judgment, plaintiff must present sufficient evidence of "pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Cooper*, 390 F.3d at 725.  Plaintiff argues that defendant's account of the incidents of October 16, 2005, is "full of falsities."  (Doc. 58 at 8.)  Therefore, the relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view

28

of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). "To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted); *see Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997)(Evidence of a pretextual explanation can be established by showing "that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the [employment decision]; or (3) insufficient to motivate the [employment decision].").   "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)). "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that ***each*** of the employer's proffered

nondiscriminatory reasons is pretextual."  *Chapman v. AI Transport*, 229 F.3d 1012, 1037

(11th Cir. 2000)(citing *Combs*, 106 F.3d at 1543)(emphasis added).

Plaintiff alleges that the incidents of October 16, 2005, were not the real reasons for

her termination because, on October 26, 2005, "the defendant[, Perkins Lenz and Frey,]

stated over and over again that the only reason [she] was terminated was because 'Alabama

was an At-Will State.'"  (Doc. 58 at 5 [citing doc. 59, Ex. A at 2-10].)  As set forth above,

Perkins Lenz did not tell plaintiff that the ***reason*** she was terminated was ***because*** Alabama

was an "at-will" state; rather, Perkins Lenz told plaintiff that she was not ***giving*** her a ***reason***

because Alabama was an "at-will" state.  (*See* doc. 59 at 9, 10; *see also id*. at 3 [indicating

that Frey told plaintiff that defendant did not have to give her a reason for her termination].)

"[The employee-at-will] doctrine, first adopted in [Alabama] in *Howard v. East Tennessee,*

*V. & G. Ry.*, 91 Ala. 268, 8 So. 868 (1891), provides that an employment contract terminable

at the will of either the employer or the employee may be terminated by either party at any

time ***with or without cause***."  *McClain v. Birmingham Coca-Cola Bottling Co.*, 578 So. 2d

1299, 1300 (Ala. 1991)(citing *Bender Ship Repair, Inc., v. Stevens*, 379 So. 2d 594

(Ala.1980))(emphasis added).  The doctrine "provides that an employment contract is

generally terminable at will by either party, with or without cause or justification – for a good

reason, a wrong reason, or no reason at all."  *Williams v. Champion Intern. Corp.*, 899 F.

Supp. 565, 570 (M.D. Ala. 1995)(citing *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725

(Ala.1987)); *see also Wyatt v. BellSouth, Inc.*, 18 F. Supp. 2d 1324, 1326 (M.D. Ala.

1998)("Under Alabama law, employers who choose to do so may arbitrarily or maliciously terminate competent and loyal at-will employees who have devoted their lives to the company." (citing *Burrell v. Carraway Methodist Hospitals of Alabama, Inc.*, 607 So. 2d 193 (Ala. 1992); *Salter v. Alfa Insurance Co.*, 561 So. 2d 1050 (Ala. 1990))).

The fact that Perkins Lenz and Frey would not tell plaintiff the reasons for her termination does not prove that the articulated reasons for her termination are unworthy of credence. *See Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998)("At most, the jury could find that performance was an additional, but undisclosed, reason for the decision; the existence of a possible additional non-discriminatory basis for [plaintiff's] termination does not, however, prove pretext.")(citations omitted).

The court finds that plaintiff has not produced sufficient evidence to allow a reasonable jury to conclude that defendant did not terminate her because she refused the patient assignment of October 16, 2005. The record contains no evidence to rebut the fact that plaintiff left work on October 16, 2005, after Perkins Lenz told her she agreed with Schrimsher, who had told plaintiff that she was to take the "worst patients." Plaintiff argues that she should have been charge nurse on October 16, 2005;[11] that she did not have an assignment because there was no determination of who was in charge and because she left

---

[11]The court notes, however, that plaintiff testified she knew that Schrimsher was charge nurse because she had seniority. (Doc. 54, Ex. 2 at 105 ["I knew she was going to be in charge. She was there longer than I was, and so she was going to be pulling charge. That [was not] a problem."].)

before she was assigned any rooms;[12] that Perkins Lenz did not investigate the confrontation
between plaintiff and Schrimsher before taking Schrimsher's side; that plaintiff should have
been given the same patients she had cared for on October 15, 2005; and that she believes
Perkins Lenz should have explained to her that if she left that day she would be fired.
Assuming that each and every one of these allegations is true, none of the facts attack head-
on defendant's articulated reason that plaintiff was terminated because she left work on
October 16, 2005, after being told she would have the front group of patients for the day.

In order to establish that a defendant's articulated reason is not worthy of credence –

> "[a] plaintiff must show not merely that the defendant's employment decisions
> were mistaken but that they were in fact motivated by [race]." [*Lee v. GTE
> Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)]. The role of this Court
> "is to prevent unlawful hiring practices, not to act as a super personnel
> department that second-guesses employers' business judgments." *Id.* at 1254.
> "Our sole concern is whether unlawful discriminatory animus motivates a
> challenged employment decision." [*Damon v. Fleming Supermarkets of Fla.,
> Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)]. Whether Wilson's conduct was
> insubordinate is not an issue for this Court to referee."

*Wilson*, 376 F.3d at 1092. In this case, the issue for the court is not whether plaintiff actually
refused to accept a patient assignment, refused to accept responsibility for her actions, and/or
could not get along with her co-workers and supervisors. "In other words, it does not matter
whether the plaintiff is actually innocent of the infraction for which the adverse employment

---

[12]Plaintiff testified, "You don't get your assignment until you go into the room where
you hear the report. You get your assignment, they tell you what rooms you have. You don't
tell the people while you're standing in the hall there in the nurses' station because you don't
know who you're going to have to give anybody an assignment." (Doc. 54, Ex. 2 at 335-36.)

action is taken; the only relevant inquiry is whether the employer believes [she] is guilty." *Masso v. Miami-Dade County*, No. 06-16611, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007)[unpublished].  Moreover, "Admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

Based on consideration of the record, the court finds that plaintiff has not presented substantial evidence from which a reasonable jury could find that defendant's articulated reason for its decision to terminate plaintiff – plaintiff's refusal to accept the patient assignment from Schrimsher – is false and that the real reason is plaintiff's race.  Plaintiff has admitted that she left work rather than take responsibility for the care of the front group patients.  Although she believes that Schrimsher should have allowed her to pick her patients for the day or assign her the patients she had the day before, the evidence is undisputed that, prior to plaintiff's departure on October 16, 2005, Perkins Lenz had told her that she agreed with Schrimsher that plaintiff should be assigned the front group of patients.  Plaintiff's decision to leave work under these circumstances constitutes a refusal to accept her work assignment; no reasonable jury could find otherwise.

Therefore, defendant's Motion for Summary Judgment as to plaintiff's race discrimination claim is due to be granted.

33

### 5.  Hostile Work Environment

Plaintiff alleges that she "was forced to work in hostility in the workplace and verbal [attacks] from white and non-African[-]American co-workers and the defendant would do nothing to prevent it; and was told that director of nursing agreed with treatment."  (Doc. 1 ¶ 26.)  In her Affidavit, plaintiff testified that her workplace did not become hostile until after her she fell on the job on July 8, 2005.  (Doc. 11, Ex. A at 3.)  Defendant contends that plaintiff's claim based on a racially hostile work environment is due to be dismissed because plaintiff cannot prove either that the harassment was based on her race or that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.  (Doc. 53 at 19-22.)  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).  To establish a claim for hostile or abusive working environment sexual harassment, an employee must show:

> (1) that . . . she belongs to a protected group; (2) that [she] has been subject to unwelcome sexual harassment . . .; (3) that the harassment must have been based on [her] sex . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding [her] employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000)(citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)); *see also Walton v. Johnson & Johnson*

34

*Services, Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276-77 (11th Cir. 2002).

"Before analyzing the alleged harassment within the rubric of these four factors, the law requires that [the court] determine which instances of harassment should be included in the analysis." *Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1153 (11th Cir. 2009).

> Although [the court] examine[s] the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] or [race]-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met.  Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party  . . . are not counted."

*Gupta*, 212 F.3d at 583 (internal citations omitted), *quoted in Corbitt*, 589 F.3d at 1153.

In *Gupta*, the Eleventh Circuit held:

> The fourth element – that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment" – is the element that tests the mettle of most [racial] harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."

*Gupta*, 212 F.3d at 583 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

 "Title VII prohibits only the type of severe or [racial] harassment that 'alter[s] the conditions of the victim's employment.'" *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000)(quoting *Oncale*, 523 U.S. at 80-81).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S.

35

at 788.  The "conduct must be *extreme* to amount to a change in the terms and conditions of

employment . . . ."  *Faragher*, 524 U.S. at 788 (citing *Carrero v. New York City Housing

Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50

(8th Cir, 1986))(emphasis added); *see also Miller*, 277 F.3d at 1277 ("[Plaintiff] did not

suffer from overhearing occasional off-color comments.  Rather, as one of his coworkers

testified, Galpin and other technicians in the Service Department used the derogatory names

in an intimidating manner, shouting them at Miller during the course of berating him for his

job performance, or when they were arguing with him, were mad with him, or were taunting

him.  This conduct rose above the level of off-handed comments in the course of casual

conversation that the Supreme Court has refused to find actionable.")(internal quotations

omitted).

In her Complaint and her Affidavit, plaintiff appears to limit her hostile environment

claim to Schrimsher's telling her she will be assigned the front patients.  (Doc. 1¶ 26; doc.

11, Ex. A at 3.)  However, in her deposition she testified that Neha Patel, an RN, told her to

"get out" of a patient's room in a nasty and rude manner; a white PCA resented her and

responded to her in a "bitter way" initially;[13] Patel and Schrimsher occasionally said "shit,"

"damn," and "hell;" and she was called "Miss Edna" by some of the white employees.  (Doc.

54, Ex. 2 at 138-39; 186-91, 191-92.)   None of these incidents are  overtly  racial.

---

[13]Plaintiff testified that her relationship with the PCAs improved "after they learned
who [she] was."  (Doc. 54, Ex. 2 at 150.)

Nevertheless, even if the court considers each incident collectively, they are not so "extreme" as to change plaintiff's terms and conditions of employment.  *See Faragher*, 524 U.S. at 788. A reasonable jury could not find that these incidents are more than the isolated tribulations of the ordinary workplace.

Therefore, the court will grant defendant's Motion for Summary Judgment as to plaintiff's race discrimination claim based on a hostile work environment and such claim will be dismissed.

### 6.  Hiring

In her Complaint, plaintiff contends that defendant had only three  African-American registered nurses and thirty-two white registered nurses.  Specifically, she alleges –

> 30.   The defendant had only three full time African[-]American Registered Nurses (RN) employed in its facility, which included the Pro Se Plaintiff; and there were at least 32 White RN[s]; with a 20,000+ population of African[-]Americans in the county.
>
> 31.  In June 2005 the Pro Se Plaintiff inquired why there were not more African[-]American nurses hired at ALH and was told by defendant "we hired you, didn't we?"

(Doc. 1 ¶¶ 30-31.)  Plaintiff testified in her deposition that she had found on the internet that about 40,000 white people lived in Limestone County at the time she was employed by defendant.  (Doc. 54, Ex. 2 at 227-28.)  However, she did not know how many people living in Limestone County were registered nurses or how many African-American registered nurses had applied for work with defendant.  (*Id*. at 224, 228-29.)

Defendant contends that it is entitled to judgment as a matter of law as to this claim because plaintiff "has not conducted any discovery or produced any statistical or expert evidence to support her allegation of discriminatory hiring and promotion practices, and cannot, therefore, establish a *prima facie* case of discrimination based on the number of African-American employees at the Hospital." (Doc. 53 at 18 [citing *Wards Cove Packing Co. v. Antonio*, 109 S. Ct. 2115, 2124 (1989)].)  The court agrees.

The law is well established that "[s]tatistics without any analytical foundation are 'virtually meaningless.'"  *Wilson*, 376 F.3d at 1089 (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir.1997)(quoting *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir.), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 935 (1992))).  Two essential factors in the statistical analysis of a hiring claim are (1) the qualified population, and (2) the applicant pool.  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1276-77 and n.13 (11th Cir. 2000).  "Statistics based on an applicant pool containing individuals lacking minimal qualifications for the job [is] of little probative value."  *In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305, 1312 (11th Cir. 1999)(quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 997 (1988)); *see also Maddox v. Claytor*, 764 F.2d 1539, 1549-50 (11th Cir. 1985).  Plaintiff has offered no evidence of the qualified labor pool or the applicant pool.

Therefore, the court finds that plaintiff has not establish a claim based on hiring and defendant's Motion for Summary Judgment is due to be dismissed.[14]

## C. RETALIATION

In her EEOC charge, plaintiff alleged, "I . . . believe I have been retaliated against for reporting the treatment of black patients in the hospital." (Doc. 72, Ex. 1, ex. 11; *see also* doc. 1 ¶ 38.) Defendant contends that plaintiff's retaliation claim is due to be dismissed because complaining that African-American patients are treated less favorably than white patients is not activity protected under Title VII.

Plaintiff does not address defendant's argument that her retaliation claim is due to be dismissed. (*See generally* doc. 58.) Therefore, the court finds that plaintiff has abandoned this claim. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)). Defendant's Motion for Summary Judgment will be granted.

In the alternative, the court finds that plaintiff cannot establish a prima facie case of retaliation. In order to establish a prima facie case of retaliation in violation of Title VII, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Title VII's

---

[14]Although not raised by defendant, the court also finds that plaintiff has no standing to raise a hiring claim. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 965-66 (11th Cir. 2008)(citing, *inter alia*, *Flast v. Cohen*, 392 U.S. 83, 99-101 (1968)).

anti-retaliation provision, 42 U.S.C. § 2000e-3(a) protects two general types of activity – (1) participation and (2) opposition.[15]  However, "not every act by an employee in opposition to racial discrimination is protected.  The opposition must be directed at an unlawful **_employment_** practice of an employer, not an act of discrimination by a private individual." *Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209, 1213-14 (11th Cir. 2008)(quoting *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 959 (11th Cir. 1997)(quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978)))(emphasis added)

The mistreatment of African-American patients is not an "employment practice." *See Hall v. New York Hospital*, 117 Fed. Appx. 790, 792 (2d Cir. 2004)("The allegedly discriminatory medical treatment given to certain of the Hospital's patients, which Hall allegedly opposed, is not an unlawful 'employment practice' protected by Title VII." (citing *See Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999)); *see also Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1316 (11th Cir. 2002)("The definition of 'unlawful employment practices' as set forth in Title VII includes such activities as making

---

[15]Section 2000e-3(a) provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a).

hiring or other job classification decisions based upon an individual's race, color, religion, sex or national origin.  See 42 U.S.C. § 2000e-2(a).").[16]

The court finds that plaintiff cannot establish a prima facie case of retaliation based upon her complaint that African-American patients were treated less favorably than white patients.  Therefore, defendant's Motion for Summary Judgment will be granted and plaintiff's retaliation claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 52), will be entered contemporaneously with this Memorandum Opinion.

---

[16]Section 2000e-2(a) defines "employer practices" as –

It shall be an unlawful employment practice for an employer –

(1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2)  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e-2(a).

**DONE** this 22nd day of March, 2010.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE